Lillian KELLEY and Pine Lawn Bank and Trust Company, a Missouri Banking Corporation, Appellants,

v.

Milton J. SCHNEBELEN, Trustee under Deed of Trust, and Julius Jensen III, as Nominee of the Trustees of Diversified Mortgage Investors, a Massachusetts Business Trust of Boston, Massachusetts, Respondents.

No. 37153.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Nov. 2, 1976.

Motion for Rehearing and for Transfer to Supreme Court Denied Dec. 20, 1976.

Application to Transfer Denied
Feb. 14, 1977.

Charles W. Medley, Farmington, W. W. Sleater, Clayton, for appellants.

Bryan, Cave, McPheeters & McRoberts, Jerome M. Rubenstein, Robert G. Brady, St. Louis, for respondents.

NORWIN D. HOUSER, Special Judge.

Bill in equity to enjoin the nonjudicial foreclosure of a first deed of trust and stop the sale of a shopping center in Bonne Terre advertised for April 18, 1975, and for other relief. Plaintiffs are Pine Lawn Bank and Trust Company and its nominee and agent (hereinafter "the bank"). The bank, owner of the property by purchase at a previous foreclosure sale under its second deed of trust, appeals from an order sustaining a motion to dismiss its petition. Respondents' brief discloses that no supersedeas appeal bond was filed by the bank; that defendants, owners and holders of the first deed of trust, readvertised and proceeded with a foreclosure sale, after this case was tried; that at that sale defendants purchased the property, and the bank failed to post a redemption bond. Passing over the question of mootness, we consider this appeal on its merits.

Appellants' first point: "The court erred in dismissing plaintiffs' petition for failure to state a cause of action because said petition did state a cause of action giving the court jurisdiction to grant relief requested." At the hearing on the motion to dismiss, matters outside the pleadings were presented to and not excluded by the court. Consequently under Rule 55.27(a) the motion is to be treated as a motion for summary judgment and disposed of as provided in Rule 74.04.

From the allegations of the petition, admissions of counsel, documentation, answers to requests for admission, affidavits, deposition of D. W. Dodds, president of the bank, and the testimony adduced at the hearing on the motion to dismiss we find no genuine unresolved issue of fact, and that movant was entitled to summary judgment as a matter of law.

These are the unassailable facts: On April 24, 1973 J.M.C. Investments, Inc. (hereinafter "JMC"), owners and developers of the shopping center, entered into a management agreement with McHarevo Development Corporation (hereinafter "McHarevo") whereby McHarevo agreed to manage the center, collect rentals from lessees, pay taxes, supervise insurance, make monthly statements showing receipts and disbursements, and remit to JMC the balance shown to be due.

On May 29, 1973 Diversified Mortgage Investors (hereinafter "DMI") and JMC signed and executed documents by which DMI agreed to lend JMC $1,300,000; JMC executed a note to DMI for $1,300,000 and gave DMI a first deed of trust on the shopping center property; JMC made a conditional assignment to DMI of its existing and future leases and rental contracts, giving DMI the right upon default by JMC in the payment of the note or its other contractual obligations to exercise all rights of the lessor, collect the rents and apply them to the payment of taxes, insurance and the note.

On May 30, 1973 JMC executed a note to the bank for $300,000 and gave the bank a second deed of trust on the property. This loan was conditioned on the execution by JMC and McHarevo of an amended management contract (drawn up by the bank's attorneys and executed at the bank on June 4, 1973 by JMC and McHarevo) providing that from the total rentals collected by McHarevo the latter was directed to "pay all sums to the order of the first mortgagee, Diversified Mortgage Investors, under the terms of the mortgage * * *"; pay all real estate taxes when due; pay premiums on all required insurance policies, and remit

the balance, if any, to the bank. The amended management contract of June 4, 1973 was executed without the knowledge of DMI at the time.

On March 18, 1974 Jerome Rubenstein, attorney for DMI, notified all tenants in the shopping center that there had been a default in the note due DMI and that the tenants should make all future rental payments to DMI, in care of Mr. Rubenstein; that payment to any other person would subject them to double liability for the rentals.

On May 6, 1974 Mr. Rubenstein notified all tenants in the shopping center to send all future rental payments to the bank, checks payable to DMI.

Many of the tenants, confused by conflicting directions as to whom rental payments should be made, went on a "rent strike" and failed or refused to make rental payments.

In July, 1974 DMI commenced proceedings to foreclose its first deed of trust. On August 8 DMI and the bank entered into an agreement whereby, for a consideration of $32,500 (representing the interest on the outstanding balance of the $1,300,000 loaned to JMC), DMI canceled the advertisement and foreclosure sale scheduled for August 12, and agreed not to advertise the property for foreclosure for 90 days from July 27, 1974. As further consideration for the cancellation and extension the bank agreed to pay, if necessary, costs and expenses in connection with readvertisement of the foreclosure sale in an amount not to exceed $1,000.

Default having been made in the payments due the bank under its loan to JMC, the bank foreclosed its second deed of trust. The bank purchased the property at the foreclosure sale, held October 25, 1974.

On November 8, 1974 DMI and the bank entered into an agreement extending the October 8 agreement to January 27, 1975 for an additional consideration of $32,500, with the same provision for the payment of $1,000 expenses of readvertising.

On March 4, 1975 Mr. Rubenstein, acting for DMI, notified all tenants that there had been a default in the note due DMI and that the tenants should make "all future rental payments" to DMI, in care of Mr. Rubenstein.

In March, 1975 DMI commenced foreclosure proceedings, advertising a sale to be held April 18, 1975. On April 15, three days before the sale, the bank brought this action to enjoin the foreclosure. A restraining order issued, the court requiring the bank to file a $2,500 bond to indemnify DMI against damages. On April 29 DMI filed a motion to dismiss the bank's petition. On May 9 there was a hearing on the order to show cause why a temporary injunction should not be issued and on the motion to dismiss. On May 28 the motion to dismiss was sustained. It is from this order that the bank has appealed.

The bank seeks injunctive relief under the general rule that injunction is the proper remedy where a mortgagee exercises a power of sale by attempting to sell the property to satisfy an amount in excess of the actual debt, based upon the allegation that rentals from tenants (supposed to be applied to payment of the debt) were not so applied because of misappropriation of the funds. See in this connection *State ex rel. Central States Life Ins. Co. v. McElhinney*, 232 Mo.App. 107, 90 S.W.2d 124 (1936); *Glines v. Theo. R. Appel Realty Co.*, 201 Mo.App. 596, 213 S.W. 498 (1919); 59 C.J.S. Mortgages § 552. The factual question is whether the agent collecting the rents was the agent of the mortgagee. Paragraph 4 of the petition alleges that McHarevo was the agent of DMI in connection with the collection of rents, and that acting in that capacity McHarevo misappropriated approximately $100,000 in rental income which sum, if applied to the payment of DMI's note, would have prevented a default; that DMI, as principal, is responsible for McHarevo's wrongdoing; that the alleged agency arises because DMI became "the owner" of the management agreement between JMC and DMI dated April 24, 1973, as amended June 4, 1973, by virtue of

the inclusion of the following language in the granting clause of the deed of trust executed by JMC, following the legal description of the real estate: "Together with all of Grantor's (JMC's) rights under a management agreement between Grantor, as 'Owner,' and McHareno (sic) Development Corp., as 'Agent,' dated April 24, 1973."

■■■ The bank's theory of agency has no basis in law. The inclusion of the words quoted above in the deed of trust did not create a presently existing agency relationship between DMI and McHarevo. This was a conveyance of JMC's rights under the April 24, 1973 management agreement *in trust* to secure payments due DMI. It was not an assignment *in praesenti* of those rights, but a *conditional assignment only,* for security purposes, to become effective as far as JMC was concerned upon foreclosure of the deed of trust. McHarevo was JMC's exclusive agent under the terms of the management agreement, which obligated McHarevo to make monthly remittances *to JMC* of any balance due JMC after deducting disbursements from receipts. McHarevo did not by operation of law become DMI's agent under that contract on the basis claimed, i. e., that the words quoted were included in the deed of trust. Nor did an agency relationship arise by virtue of a manifestation of consent, either by DMI or McHarevo, that the latter was to act on behalf of DMI and be subject to its control. "The relationship of agency wherein the principal may be bound by the acts of the agent results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control. In addition, the other must consent to act for the principal and be governed by his direction." *McAuliffe v. Vondera,* 494 S.W.2d 692, 693[1] (Mo.App. 1973). These principles were announced by the Supreme Court in *Leidy v. Taliaferro,* 260 S.W.2d 504, 505[2, 3] (Mo.1953); and see 2A C.J.S. Agency § 36.

There was no obligation on McHarevo, under the management agreement of April 24, to make payments to DMI, except "when so directed by (JMC), and if sufficient funds are provided by (JMC)."

The bank, however, says the April 24 agreement was "amended" by the June 4 agreement, which did require McHarevo to make payments to DMI, and that this resulted in the creation of an agency as between McHarevo and DMI. This does not follow. DMI was not a party to either agreement, and DMI had no knowledge of the June 4 agreement at the time of its execution. While the agreement of June 4 shows consent by McHarevo to act in DMI's behalf, still lacking is any manifestation that McHarevo agreed to be governed by or subject to the control of DMI in any particular. There is no showing that after June 4 McHarevo did in fact make any such payments to DMI. Indeed, the bank concedes that plaintiffs "have no idea" whether the rents paid by the tenants to McHarevo between June, 1973 and August 8, 1974 went to JMC or to DMI, "and further appellants have no idea as to whether any rents were allocated to amortize the first mortgage." There is no indication that DMI accepted McHarevo as its agent for this purpose.

The bank further asserts that the conditional assignment of rents by JMC to DMI, exemplified by the loan agreement, the conditional lease and rental assignment, demonstrate the intent of the parties that McHarevo be the agent of DMI with respect to the collection of the rents. We are not so persuaded. That McHarevo did not in fact act as the agent of DMI for this purpose is evident from the testimony of Mr. Dodds, president of the bank, that McHarevo's employee Mrs. Meyers, who did the actual collecting of rents, turned the rents over to one Donald Caifano, and did not apply these funds to the debt service on DMI's and the bank's loans. When asked to explain just how McHarevo became the agent of DMI, Mr. Dodds testified that he did not know. On full review of the entire record we are unable to find the existence of the agency alleged by the bank.

■■■ Accordingly, any alleged misappropriation of approximately $100,000 by McHarevo is not attributable to DMI on the

basis of agency, and the bank had no right to stop the foreclosure on the basis of paragraph 4 of its petition.

■ The bank argues that, assuming JMC was *not* the agent of DMI, the matter of *more than* $100,000 rent paid but not applied to the first mortgage note, has never been accounted for, and that the bank is entitled to an accounting with respect to these rents prior to any foreclosure and sale, citing *State ex rel. Central States Life Ins. Co. v. McElhinney,* 232 Mo.App. 107, 90 S.W.2d 124 (1936). The assertion of a right to an accounting was not pleaded by the bank in its petition; no proof was offered in that connection; the subject was not in issue and was not mentioned at any time below. Now on appeal, for the first time, the bank asks for an accounting. The bank's request is ill-timed. It is too late at this late stage to ask for this new relief. *Green v. Clyde,* 80 Ark. 391, 97 S.W. 437[3] (1906); *Strachan v. Drake,* 61 Colo. 444, 158 P. 310 (1916). Furthermore, the party accused of misappropriating the rentals—the party who allegedly collected them (McHarevo)—is not a party to this action. The bank is asking for an accounting from DMI, which never received the rentals. The request for an accounting is not only tardy; there is no party to this action liable to respond to such a demand.

■ In paragraph 5 of the petition the bank takes the startling position that DMI should not be allowed to foreclose because the loan by DMI to JMC is not in default, for the reason that paragraph 2 of the loan agreement provides: "The entire outstanding principal balance of the Loan and all accrued and unpaid interest thereon shall be due and payable three (3) years from the date hereof" and therefore interest was not payable until May, 1976. This contention flies in the face of paragraph 5 of the loan agreement, which provides that the loan shall be repaid in accordance with the repayment schedule described in Exhibit C, which says: "Payments of accrued interest shall be made on the first day of the first month following the initial disbursement of the Loan and on the first day of each month thereafter * * *." The note provides: "Interest * * * shall be due and payable on the first day of the month following the date hereof and on the first day of each month thereafter until the entire outstanding principal balance and all accrued interest thereon are paid in full." The borrower, JMC, interpreted the loan documents to require immediate monthly payments and JMC actually made a number of monthly payments before going into default. In oral argument counsel for the bank conceded that the bank is not contesting that there was a default. There is no merit in paragraph 5.

■ In paragraphs 6 and 7 of the petition the bank complains that it paid DMI a total of $65,000 for two agreements to extend the time of foreclosure ($32,500 for each agreement), on the representation that the first deed of trust was not in default, which representation was falsely made to induce these payments, as a result of which DMI is estopped to declare a default; that under these extension agreements the bank was entitled to all rents accruing between July 27, 1974 and January 27, 1975, in an amount in excess of $50,000, but that DMI in breach of these agreements and by interfering with the bank's contractual rights, did on March 4, 1975 advise all of the tenants to make no further payments to the bank. The latter suggestion is without merit because Mr. Rubenstein's letter of March 4, 1975 referred to "all future rentals." It did not refer to payments due for rent in the past, i. e., during the period in question.

With respect to the allegation of estoppel, the suggestion that DMI represented that there was no default is frivolous under the evidence in this case, including the deposition of President Dodds, which clearly indicates that DMI representatives told him that if the money was not paid the loan would be in default; that if the money was paid "it would extend the note so that it would not be in default." The two extension agreements (signed by DMI and the bank) recite that the $32,500 payment "constitutes interest on the outstanding balance of One Million Three Hundred Thousand

Dollars," which indicates that payment was being made in an amount due; the amount necessary to avoid default.

■ With respect to the claim that the bank is entitled to the rents during the 6-month period above referred to, the facts demonstrate an anticipatory breach on the part of the bank, which failed to pay the 1974 real estate taxes and failed to pay the expenses of republication, as promised, as a result of which the bank is in no position to complain of any breach of the agreement by DMI. Furthermore, for any alleged breach of contract the bank had its remedy at law for damages.

As far as the charge that Mr. Rubenstein interfered with the bank's rights by sending the letter of March 4 is concerned, the record shows that on May 27, 1975 Mr. Rubenstein notified all tenants that the phrase "all future rentals" contained in his letter of March 4 should not be construed to include rental payments for the period July 27, 1974 through January 27, 1975; that DMI waived its claim for rentals for that period.

■ None of the reasons assigned by the bank is sufficient to enjoin the foreclosure of the first deed of trust. The interest had not been paid for months; the real estate taxes were unpaid; Mr. Dodds testified that the 1974 real estate taxes had not been paid, and that alone entitled DMI to foreclose; nowhere in the extensive correspondence carried on by Mr. Dodds was it suggested that the payments on the note and first deed of trust were not in default. Counsel conceded default. DMI was entitled to foreclose. The order restraining the conduct of the foreclosure sale was improvidently issued, wholly aside from any question of mootness. We find no merit in Point I of the bank's brief.

■ Point II asserts that the court erred and abused its discretion by failing to give the bank an opportunity to amend the petition after sustaining the motion to dismiss. The fact fatal to this contention is that the record shows that the bank did not ask the court for leave to amend. The post-trial record shows only a motion for rehearing, an order overruling that motion, and a notice of appeal. In *Cady v. Hartford Accident and Indemnity Company,* 439 S.W.2d 483, 486 (Mo.1969), the Court stated: " 'If a plaintiff desires to file an amended petition, it is up to him to ask leave to do so.' *Jones v. Williams,* 357 Mo. 531, 209 S.W.2d 907, 911."

■ Another reason why the court did not err in dismissing the petition is that the bank failed to sustain the allegation that it has no adequate remedy at law. It appears that there is or was an adequate remedy at law for each of the complaints set forth in paragraphs 4 through 7 of the petition, and that foreclosure will not cause the bank to suffer irreparable injury within the meaning of that term in law.

Judgment affirmed.

SMITH, C. J., and ALDEN A. STOCKARD, Special Judge, concur.